## Columbia Malting Co. v. Glenmore Distilleries Co.

(Decided October 25, 1912.)

Appeal from Daviess Circuit Court.

1. Contracts—Purchase of Malt for Distillery.—Where a distillery purchased several carloads of malt for use in its business of making whiskey, received it, and used it before making complaint, it should pay for the malt notwithstanding the provision in the contract that it should be satisfactory, and notwithstanding that it was discovered to be unsatisfactory at the time and when the distillery used it.

2. Contract—Provision Omitted from Contract—Negligence—Mistake.—A party should not be permitted to take advantage of what was omitted from a contract if it was omitted by its own negligence.

3. Contracts—Trade Custom—Intention of Parties.—The contract

under which the malt was sold was explicit as to how it was to be tested, and although there may be a' trade custom allowing its use before complaint; such trade custom cannot (be permitted to contradict the express agreement of the parties, and testimony as to the admission of the trade custom. was incompetent and should have .been excluded.

E. B. ANDERSON for appellant.

SWEENEY, ELLIS & SWEENEY for appellee.

OPINION OF THE COURT BY JUDGE WINN—Reversing.

The Glenmore Distilleries Company bought from the Columbia Malting Company a number of cars of malt under the following contract:

Owensboro, Ky., Sept. 18, 1908.

Columbia Malting Co.,
       234 LaSalle St.,
              Chicago, Ill.

Dear Sirs:—

(1) Confirming our telephonic agreement with your Mr. E. A. Graff:

(2) You will please ship to us at Owensboro, Ky., one car of your best Distillers' Malt (clean, sound and screened) in bags.

(3) It is understood that the above car, as well as each car of malt we may receive from you during the season shall on analysis by our Louisville Chemist, be found not. to exceed 5½% moisture, shall not contain less than 68.14% extract, shall have a diastatic power of not less than 1450, and shall be satisfactory to us.

(4) Each 34 pounds of malt equals a bushel, with the understanding that you guarantee the weights, on arrival at our bins, to be within one per cent of your invoice weights.

(5) Price shall be seventy-six and one-half cents (76½c) per bushel f. o. b. Owensboro, Ky., and terms shall be 30 days net from the first of the month following the arrival of the malt, with privilege on our part to make prior payments of any invoice or invoices, at a discount at the rate of 6% per annum.

(6)   It is understood that if the above car proves satisfactory to us, we shall continue to receive from you (and you hereby agree to furnish) the balance of the fifteen thousand bushels of malt, to be taken between now and March 1, 1909.   The bags are to be charged to our account when shipments are made and credited to us when they are returned in good condition to you.   It is further understood that each car shall, during said season, come fully up to the requirements named in paragraph No. 3 of this letter.

(7)   It is understood that if, during the above season, there shall be made any reduction in freight rate on malt from Chicago to Owensboro, we are to be given advantage of the decrease on such car or cars shipped at the said lower rate.

(8)   This letter is in duplicate, one copy of which please accept and return to us.

Yours truly,<br>
GLENMORE DISTILLERIES CO.,<br>
By JAMES THOMPSON,<br>
Its President.

Accepted:

THE COLUMBIA MALTING CO.,

By E. A. GRAFF, President.

The cars of malt were duly shipped from the plant of the appellant in Chicago to the distilling plant of the appellee in Owensboro and there used in distilling whiskey.   The distilleries company did not cause any chemical analysis to be made of any of the malt before using it.   After the malt had been used, when the malting company demanded payment, the distilleries company declined to pay, upon the ground that the malt had not come up to the specifications named.   The malting company thereupon brought this action in the Daviess Circuit Court to recover the agreed price of the malt.   The distilleries company filed answer, pleading the defective condition of the malt, and asserting that the company had been damaged in the sum of $1,143.89. Demurrer was sustained to the original answer upon the ground that the defendant had seen fit to accept and use the malt without making the chemical test or analysis provided for in the contract.   The defendant then amended it.   In the amendment it alleged that it was a part of the agreement that the defendant should have the right to use the malt without prior analysis;

and then if the malt proved defective, to make claim for the damage; and that this understanding or agreement was omitted from the contract "by oversight and mistake of the draughtsman." It was also alleged in the amended answer that the contract was entered into with reference to an ancient, general, certain, uniform and notorious trade custom or usage existing between malt dealers and their customers, to the effect that the customers should use it upon arrival without prior test or analysis, and if, after a prudent use of it, the malt did not produce the yield stipulated and provided for in the contract, or was not of the quality called for, then the purchasers could have it analyzed; and that they would not waive, by first using the malt, their right to damage if the malt had proven defective. Issue was joined, proof heard, and without the intervention of a jury, the case tried. The trial judge allowed the distilleries company a credit of $400 by way of damages upon the account sued on. From that judgment this appeal is prosecuted. The appellant complains:

1. That though the malt furnished by the appellant did not come up to the terms of the contract, the distilleries company having accepted and used the malt after opportunity of inspection, without exercising its contract right of analysis, cannot recover damages for any defect in it.

2. That it is neither plead nor proven that anything was omitted from the written contract by the mutual mistake of the parties—that a written contract cannot be altered by allegation and proof of omitted matter, unless the omission was by the mistake of both, and not one, of the parties.

3. (a) That it is not proven that there was any custom of the trade which would allow the distilleries company first to use the malt and thereafter recover for its defect; and (b) that even if there were such trade custom, it is not permissible to prove it where it is repugnant to and inconsistent with the express terms and meaning of the written contract.

Appellant concedes in its brief that where a vendee receives personal property with a fair chance to inspect it, he cannot thereafter claim that the goods were defective in character or quality. It argues, however, that the principle is not applicable here because it

says, and to some extent supports what it says, that a reasonable opportunity and a fair inspection would not have revealed the defects in the malt. Possibly this is true; but we are struck with the testimony of R. B. Mullen, the superintendent of the distillery. He testified that when the grinding of the first of this malt started, it was discovered that it was not satisfactory and that it would not pulverize in the grinding; that one cause of its not pulverizing was that it was too moist; and that good malt would pulverize. Notwithstanding, therefore, that the distilleries company knew from the beginning that the malt was too moist and would not pulverize, it received the several carloads of the malt, ground them and destroyed their identity entirely before making complaint. It is difficult to understand, therefore, how it can be heard to say that a fair inspection of the malt would not have disclosed its defective character. But if we omit the testimony named from our consideration, it yet follows that the written contract itself provided how the character of the malt was to be determined; i. e., by a chemical analysis made of it by the distilleries company's own chemist. It did not have this analysis made, it did not follow the method of inspection which it had itself provided. The vendee here had its fair opportunity of inspection in the pre-eminently satisfactory way for which it had contracted. On the first proposition, therefore, it appears to us that the appellant is right.

But, says the appellee, it was agreed between the parties that the malt might first be ground without analysis, and afterward complaint be made; and that this understanding was left out of the contract "by oversight and mistake of the draughtsman." The draughtsman of the contract was the president of the distilleries company. He acted for the company in drafting it. He does not testify that the agreement plead was omitted from this contract by misake. He does endeavor to say that during transactions in the past between the same parties there had been trouble about malt; that he, the witness, remembered distinctly telling Mr. Graff, of the malting company, that the distilleries company could not analyze the malt and keep it lying on the track, because of demurrage charges, and that if the the malt did not show up to be first class, it could be shown by analysis; that if the

distilleries company did not get the yield, it would hold the malting company responsible. He says that these statements were made in the telephone conversation alluded to in the first section of the letter contract. But that letter contract sets out to be a completed statement of the contract made over the telephone. The testimony above detailed is insufficient to show otherwise. It would not be sufficient to take the case to a jury. Mr. Graff, on the other hand, testifies that the letter contract was the complete contract. The contract bears date September 18, 1908. The cars about which this litigation arises were not delivered until January-February, 1910, and after one entire season's malt had been delivered under it. Previous troubles had come up about the malt. The man who wrote the contract must have known what was and what was not in it. The party complaining of such a mistake must move promptly on its discovery. The mistake must be mutual. It must be free from negligence. Duff & Oney v. Rose, et al., 149 Ky., 482. "It is a peculiar province of courts of equity to correct or to relieve against mistake, but such relief will not be granted to the party who caused the mistake, when to correct it would shift the loss upon another." Hobson's Exor. v. Commonwealth, &c., 70 Ky., 649. We are of opinion that the mistake was neither sufficiently alleged nor proven; and that upon the doubtful testimony, the appellee should not be permitted to take advantage of what was omitted, if it was omitted, from the contract by its own negligence.

The third proposition will be discussed as though there had been proven in the case the existence of the trade custom allowing the use of the malt before the making of the complaint; and confine ourselves only to the question whether such trade custom is to be admitted when it is repugnant to or inconsistent with the express terms of the written contract. Let it be remembered that the contract itself says how the malt was to be tested. In Tamplet, &c. v. Saffell, 15 K. L. R., 31, it was said no custom or usage, however well established, could be incorporated into a contract if it were inconsistent with the clear intention of the parties; that an express exclusion was not necessary, but that it was sufficient that the custom be excluded by necessary implication. In City of Covington v. Kanawha Coal &

Coke Co., 89 S. W., 1126, the effort was by a coal company to escape damage for its failure to deliver a certain quantity of coal by pleading the existence· of a trade custom to the effect that an absolute agreement to deliver was subject to strikes at the mines. Our view is so well expressed in that case that we content ourselves by quoting from it here and inviting attention to the cases cited in it. It said:

"In the case at bar there is nothing equivocal or obscure in the contract. The evidence offered does not show that any word in the contract was employed in a sense different from its usual or natural meaning. The evidence does not annex an incident to the contract, within the proper meaning of this term. The contract on its face obligates the coal company absolutely to furnish the city with all the coal it may require, as requested by the superintendent of the waterworks, at the price named in the contract. The evidence offered, if admitted, was in effect that there was not an absolute contract to furnish the coal, but only a conditional engagement to furnish it, providing the coal company was not prevented from doing so by strikes, or other causes beyond its control, which disabled it from getting the coal from the coal district. This evidence is repugnant to and adds new terms to the contract. It does not go to interpret or explain, but to contradict, what is written. If the party entering into a contract of this sort desires to protect himself against contingencies, it is incumbent on him to express the contingency in his contract; and if he fails to do this, in the absence of fraud or mistake, he cannot show a custom to the effect that his absolute contract is not what it reads, but only a conditional engagement."

In the case at bar it was clearly and unequivocally stated that the malt should be tested by anaylsis. It could not, of course, be tested after it had been mingled with the other components of distillation. The trade custom relied upon here cannot be permitted to contradict the express agreement of the parties. The testimony as to the admission of the trade custom was incompetent and should have been excluded.

But, says the distilleries company, that had it not accepted the malt, it would have been compelled to shut down its business, and that it took several days to make an analysis. The proof indicates that an analysis could be made by a chemist in from one to two days.

However, with this argument we are not to concern ourselves. If the distilleries company desired the right to first grind and then complain, it should have so contracted; and if it suffers inconvenience or loss because it did not so contract, it must take the consequences.

The distilleries company further says that not only did the malt have to meet the chemical analysis above named, but that it had to be otherwise satisfactory under the third clause of the letter contract. It knew, according to its own superintendent, the day that it ground the first of this malt that it had too much moisture, would not pulverize, and was unsatisfactory. It should have spoken then, instead of receiving the other cars and grinding them up before speaking.

Other incompetent testimony was admitted against the appellant, but in view of the conclusions we have reached it is unnecessary to discuss it. The contract was free from ambiguity and was written by the manifestly intelligent hand of the president of the distilleries company, according to the form upon which he himself insisted. The malt, notwithstanding the provisions of the contract and notwithstanding that it was known to be unsatisfactory from the beginning, was accepted by the distilleries company and its identity destroyed in its distilling operations before complaint was made. Under the facts as presented and the law applicable it should pay for the malt.

Judgment reversed and cause remanded.